**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                             **Criminal Case No.: 1:20-CR-40**
                                         **(JUDGE KEELEY)**

**DANIEL PORTER CRITCHFIELD**,

       **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT**
**DEFENDANT'S MOTION TO SUPPRESS BE DENIED**

Presently pending before the undersigned Magistrate Judge is Defendant's Motion to Suppress Physical Evidence [ECF No. 20], filed on October 2, 2020. By Order dated that same day [ECF No. 21], United States District Judge Irene M. Keeley referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The undersigned also is in receipt of the Government's Response to Defendant's Motion to Suppress Physical Evidence, filed on October 7, 2020 [ECF No. 23]. The undersigned conducted a hearing on Defendant's motion on January 13, 2021, at which the Court heard witness testimony and accepted exhibits into evidence.

Based on a detailed review of Defendant's Motion [ECF No. 20], the Government's Response [ECF No. 21], the exhibits introduced into evidence at the hearing on Defendant's motion, and the testimony given by witnesses at said hearing, the undersigned **RECOMMENDS** that Defendant's motion be **DENIED** as set forth herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Daniel Porter Critchfield ("Defendant") stands accused in a single-count indictment which a Grand Jury returned against him on September 1, 2020. [ECF No. 3]. Defendant is named in the Indictment with the offense of Unlawful Possession of Firearm, in violation of Title 18, United States Code, Sections 922(g)(3) and 924(a)(2), based upon allegations of Defendant knowingly being an unlawful user of a controlled substance.

Defendant was detained by the Bridgeport, West Virginia Police Department ("BPD") on the morning of February 25, 2016. On this morning, Defendant was walking through the neighborhood of the home of Charles Gerhart ("Gerhart"), who was and still is a federal postal inspector. Upon eyeing Defendant walking through the neighborhood, Gerhart, who was leaving his home to go to work, deemed Defendant suspicious.

Gerhart called the mobile phone of a contact at BPD, Deputy Chief Randy Hartley ("Hartley"), to report Defendant. Ultimately, Hartley and a colleague, Lieutenant Michael J. Lemley ("Lemley")[1], located Defendant walking along Airport Road. Upon locating Defendant, Hartley directed Defendant to the side of the road with a hand gesture, detaining him. Defendant was carrying a pistol from the pocket of his hooded sweatshirt. Further, law enforcement determined that Defendant unlawfully used controlled substances. These factors gave rise to Defendant's arrest and the Indictment.

In his motion to suppress, Defendant argues that law enforcement did not have reasonable suspicion to detain him. Thus, according to Defendant, any evidence later obtained by law enforcement pursuant to detention – here, especially, the firearm, but also, presumably, evidence of unlawful use of controlled substances – must be suppressed. The Government, on the other

---

[1] Lemley testified that he now is retired from BPD and works for an excavating company.

hand, opposes Defendant's motion, arguing that law enforcement had reasonable suspicion to detain Defendant such that the evidence concerning the firearm and controlled substances is admissible. The issue before the Court is whether there was reasonable suspicion under the circumstances to detain Defendant.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on January 13, 2021, the Court heard sworn testimony from two witnesses, namely, Gerhart and Lemley.

The Court also received into evidence the following: (1) Government's Exhibit 1, Bridgeport Police Department's Report of Investigation [ECF No. 31-1], (2) Government's Exhibit 2, a DVD containing a video recording of Bridgeport Police Department's interview of Defendant shortly after his arrest, (3) Government's Exhibit 3, a map of the area in which Defendant was walking at the time of his detection and detention, (4) Government's Exhibit 3-A, the map which is Government's Exhibit 3 incorporating Gerhart's markups of the same made during his testimony at the suppression hearing, (5) Government's Exhibit 4, a transcript of certain testimony in Defendant's trial in the Circuit Court of Harrison County, West Virginia concerning charges of possession of a controlled substance arising out of the same events as those resulting in the instant matter, (6) Government's Exhibit 5, a map depicting a larger area in which the events of February 25, 2016 giving rise to this matter occurred, and (7) Government's Exhibit 5-1, the map which is Government's Exhibit 5 incorporating Gerhart's markups of the same made during his testimony at the suppression hearing.

### A. Gerhart's Testimony

According to Gerhart's testimony at the suppression hearing,[2] Gearhart encountered Defendant, who was on foot in Gerhart's neighborhood in Bridgeport, West Virginia, on February 25, 2016. [2:40:39 to 2:41:12]. Specifically, on that date, at approximately 8:00 a.m. or 8:30 a.m., Gerhart was leaving his home for work. Id. Gerhart's home was on Fifth Street. [2:40:35 to 2:40:42]. Upon exiting his home, Gerhart saw Defendant to his left, walking out of a nearby alley that intersects with Fifth Street. [2:41:11 to 2:41:15]. The alley loops to the back of Oliverio's Restaurant, where the restaurant's employee parking lot is situated. [2:43:15 to 2:43:25]. Defendant caught Gerhart's attention because a nearby home in the direction from which Defendant was walking was unoccupied at the time. [2:41:15 to 2:41:30]. Gerhart locked eyes with Defendant [2:41:43 to 2:41:58]. Gerhart testified that, based on his training and experience, Defendant gave Gerhart a look as if he had been caught being up to no good. Id. Gerhart then got into his personal vehicle to go to work. [2:42:00 to 2:42:04].

Gerhart's vehicle on Fifth Street was pointed toward Route 50. [2:42:06 to 2:42:24]. Gerhart was looking up in the other direction, back up Fifth Street toward Grand Avenue, away from Route 50. Id. Gerhart testified that Defendant again looked at him in a suspicious way. Id. Defendant was walking up Fifth Street toward Grand Avenue. [2:44:38 to 2:44:45]. Gerhart turned his vehicle around and drove up Fifth Street, away from Route 50 and toward Grand Avenue. [2:44:46 to 2:44:57]. Gerhart turned right on Grand Avenue. [2:44:58]. When Gerhart turned right onto Grand Avenue, Defendant then was walking back towards Gerhart, in the direction from which Defendant had just come. [2:44:59 to 2:45:20].

---

[2] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on January 13, 2021, which is located on the section of the Court's intranet site for FTR recordings.

At this point, Gerhart observed Defendant's attire: a hooded sweatshirt with the hood up and a ballcap, [2:46:19 to 2:46:30]. The sweatshirt had "Fox Racing" lettering on it. [2:53:48 to 2:53:42]. He saw that Defendant was a white male with facial hair. [2:53:52 to 2:53:55]. Gerhart observed the large front pocket of Defendant's sweatshirt, noting that it contained something weighty enough for the sweatshirt to hang below Defendant's crotch. [2:46:31 to 2:46:50]. Gerhart could not see anything protruding from the pocket of the sweatshirt. [2:46:52 to 2:47:00]. Gerhart did not make contact with Defendant. [2:47:09 to 2:47:11].

Gerhart then placed a call from his mobile phone to Hartley's mobile phone to report Defendant. [2:47:11 to 2:47:22]. Gerhart knew Hartley professionally. Id. Gerhart gave Hartley a description of Defendant and the reason why Defendant was suspicious to Gerhart, and told Hartley the direction in which Defendant was walking. [2:48:25 to 2:49:00]. Hartley told Gerhart that he and Lemley would leave the BPD station to search for Defendant. [2:47:28 to 2:47:36]. Driving down Grand Avenue, Gerhart then turned his vehicle around near the area of Fourth Street to try to determine where Defendant was going. [2:47:54 to 2:47:59]. Gerhart remained on the phone with Hartley throughout this time, with each of them activating their speakerphones to maintain the conversation. [2:48:00 to 2:48:05].

During the time Gerhart was turning around his vehicle on Grand Avenue near Fourth Street, he lost sight of Defendant. [2:49:12 to 2:49:21]. Gerhart then returned to his home and got into his work vehicle, a law enforcement car. [2:48:12 to 2:48:17]. Gerhart intended to resume his search for Defendant. [2:49:40 to 2:49:51]. Gerhart then heard from Hartley and Lemley over his speakerphone that they had located a subject matching Defendant's description. [2:50:00 to 2:50:13]. The subject was located across Route 50 from Oliverio's Restaurant, near Glotfelty Tire Center. Id. Over speakerphone, Gerhart heard Hartley or Lemley exclaim something about the

Defendant having a gun, and Gerhart proceeded to the scene to assist. [2:50:14 to 2:50:26]. By the time Gerhart arrived on the scene, BPD had handcuffed Defendant; Gerhart confirmed that the arrestee was the same person about whom he had placed the call to BPD. [2:50:38 to 2:50:44].[3]

On cross-examination, Gerhart summarized why Defendant looked suspicious and what he conveyed to Hartley about Defendant being suspicious: Defendant was emerging from an alley near an unoccupied residence; Defendant looked at Gerhart as if he had been caught doing something he should not have been doing; and Defendant was re-tracing his steps once Gerhart caught up to Defendant by vehicle. [2:54:25 to 2:55:09]. Gerhart further summarized that Defendant's hooded sweatshirt, with the weighted front pocket, was of concern because it may have indicated that Defendant had broken into something. [2:55:03 to 2:55:15]. The time of day of Defendant's presence in the neighborhood also was suspicious to Gerhart. [2:57:27 to 2:57:31]. Gerhart further testified that, having been in law enforcement for 16 years at that time, something weighing down a sweatshirt pocket in such a fashion could be weapons, tools, flashlights or other indicia of theft or other criminal activity. [2:57:22 to 2:58:36]. Gerhart recalled that he told Hartley simply that the sweatshirt pocket was weighted, without relaying more detail, because this bit of information, without specifying more, conveyed Gerhart's suspicions, coming from one law enforcement officer to another. Id.

### B. Lemley's Testimony

Lemley testified that on approximately 8:40 a.m. on February 25, 2016, he was at the BPD station when Hartley requested that Lemley accompany him in response to a phone call from Gerhart. [3:03:05 to 3:04:30]. Hartley was speaking with Gerhart on Hartley's mobile phone. [3:08:50 to 3:08:58]. Lemley understood that Gerhart was concerned about a suspicious person.

---

[3] Government's Exhibits 3-A and 5-A, respectively, contain Gerhart's markings to show the locale where these events occurred, and the respective locations of Gerhart and Defendant and their directions of travel.

—

[3:08:58 to 3:09:27]. Specifically, Lemley understood that the subject about whom Gerhart was concerned had something bulky in his front pocket, as if the subject was concealing something. Id. Lemley further understood that the subject had noticed Gerhart observing him, and then eluded Gerhart. [3:09:39 to 3:09:54].

Lemley got into Hartley's police vehicle with him, and rode in the front passenger seat. Id. Hartley's police vehicle was an unmarked, white Ford Explorer. [3:04:30 to 3:04:47]. The lights on the vehicle were installed in such a way that they were visible when turned on but not visible when turned off. Id. As he was preparing to leave the police station, Lemley instructed BPD's Patrolman Barto ("Barto") to go to the area, as well. [3:04:53 to 3:05:07].

As Lemley and Hartley proceeded to the area via Route 50, near its intersection with Fifth Street, they saw a subject matching the description given by Gerhart. [3:05:13 to 3:05:36]. This subject was walking along Airport Road near Glotfelty Tire Center. Id.[4] Hartley drove the vehicle from Route 50 onto Airport Road. [3:05:38 to 3:05:54]. In so doing, Lemley and Hartley drove up behind the subject, who was walking in the same lane of travel as they were driving. Id. The subject was walking toward the right edge of the road, near the white line. [3:23:38 to 3:23:42]. There was not a sidewalk on Airport Road. [3:23:43 to 3:23:46]. The subject turned around and looked at the vehicle driving up behind him. [3:05:54 to 3:05:56]. At that moment, Hartley pointed to the right side of the road, and the subject started walking to the right side of the road. [3:05:56 to 3:06:04].

As the subject walked to the right side of the road, he turned his body to his right. [3:06:06 to 3:06:14]. The subject appeared to be hiding the front part of his body from Hartley's sight. Id. In so doing, the front of the subject's body was more visible to Lemley, who was in the front

---

[4] The intersection of Route 50 with Fifth Street, and the intersection of Route 50 with Airport Road, are in close proximity to one another. Glotfelty Tire Center is across Route 50 from Oliverio's Restaurant, on the same side of Route 50 as Airport Road. See Government's Exhibits 3, 3-A, 5, and 5-A.

passenger seat. [3:06:15 to 3:06:21]. The subject had his right hand in the pocket of his hooded sweatshirt. [3:06:22 to 3:06:28]. As Hartley was stopping the police vehicle, Lemley saw the subject pulling something from the pocket. [3:06:30 to 3:06:34]. As Lemley opened his door to exit the vehicle, he saw that the item which the subject pulled from his pocket was a handgun in a holster. [3:06:35 to 3:06:41]. Lemley drew his weapon, staying behind the cover of the open police vehicle door. [3:06:42 to 3:06:48]. The subject moved his other hand (his left hand) toward the gun. [3:06:49 to 3:07:00]. It was unclear to Lemley what the subject was doing with the gun, and Lemley began to depress the trigger of his own weapon. [3:07:00 to 3:07:05]. Lemley gave verbal warnings for the subject to drop the gun. [3:07:06 to 3:07:16]. Hartley also gave verbal warnings for the subject to drop the gun. Id.

The subject dropped the gun. [3:07:17 to 3:07:20]. The gun hit the ground, and then the subject dropped the gun's magazine from his left hand. [3:07:21 to 3:07:27]. The subject put his hands in the air and complied with Lemley's instructions. [3:07:33 to 3:07:52]. Lemley then handcuffed the subject and patted him down. Id.

Upon patting down the subject, Lemley found the following: a flashlight in the front pocket of the sweatshirt; another flashlight in another pocket; a pair of gloves in his back pocket; and a small silver container with nine pills. [3:10:24 to 3:10:45]. As for the pills, six of them were small white, round pills; an oblong hydrocodone pill; a long, thin pill; and a small blue pill. [3:10:56 to 3:11:07]. Lemley could not recall what kinds of pills these were other than the hydrocodone pill, without looking at the police report. [3:11:10 to 3:11:22].

On cross-examination, Lemley testified that a hooded sweatshirt with a bulge could "mean any number of things." [3:22:00 to 3:22:09]. Lemley testified that, given the situation at hand and the source of the call to BPD, the concern about the pocket of the sweatshirt was that "he had

something in it – whether it was something taken from someone – I don't know what it could've been until we were able to locate him." [3:22:30 to 3:22:51].

Further, on cross-examination, Lemley stated that Defendant walking along Airport Road in the manner in which he was walking was not, in itself, suspicious. [3:23:53 to 3:23:58]. Defendant looked back over his shoulder as the police vehicle pulled up behind him, and then moved farther over to the right side of the road in response to Hartley's gesture for him to do so, following Hartley's command. [3:25:30 to 3:25:56]. Lemley indicated that the only lights of the police vehicle which were on at this time were the rear emergency lights. [3:26:19 to 3:26:26]. Lemley stated that, although he does not know if Defendant could have seen those lights, that they are remarkably bright and illuminate the surrounding area. [3:26:55 to 3:27:25].

Also, on cross-examination, Lemley stated that both he and Hartley were wearing police uniforms, although they were not wearing hats inside the vehicle. [3:27:26 to 3:28:00]. While the police vehicle was unmarked, it was not an undercover vehicle. [3:28:14 to 3:29:22]. It had a spotlight on the driver's side, antennas and similar gear on the exterior, and possibly a license plate on the front indicating its unit number. Id. When Hartley was motioning to Defendant to go to the side of the road, it was a stop to conduct an investigation of Defendant. [3:29:23 to 3:29:31]. Defendant was not free to leave until Lemley and Hartley determined who he was and what he was doing. [3:29:32 to 3:29:45].

In addition, on cross-examination, Lemley did not see anything suspicious about Defendant prior to Defendant turning his body away from the police vehicle, which happened after Defendant was complying with Hartley's gestured command for Defendant to go farther to the side of the road. [3:24:35 to 3:24:46]. To Lemley, the manner in which Defendant then turned his body, seemingly to conceal the front of himself, was suspicious. [3:30:55 to 3:31:12].

Finally, on cross-examination, Lemley stated that at that time in West Virginia, open-carry of firearms without a permit was legal. [3:33:00 to 3:34:22]. Further, concealed-carry of firearms was legal in West Virginia with a permit. Id. Lemley and Hartley did not know at that moment whether Defendant had a permit for concealed-carry of a firearm. Id. At the time of his detention, Defendant did not remove the firearm from the holster and never pointed the firearm at anyone. [3:34:23 to 3:34:58]. The trigger of the firearm was not accessible while it was in the holster. [3:35:36 to 3:35:42].

### C. Other Evidence

It is indicated in the police report that the pills found on the subject were as follows: (1) six white round pills, being 8 mg buprenoxphine, (2) one white, oblong pill, being 10 mg hydrocodone, (3) one thin, long pill being 2 mg Xanax, and (4) one blue, egg-shaped pill, being 10 mg dextroamphetamine. It is further indicated in the police report that the officer located a wallet on the subject and, from an identification card in the wallet, identified the subject as Daniel Porter Critchfield of Bridgeport, West Virginia – the Defendant. Finally, it is indicated in the police report that Barto arrived on the scene of the arrest, took possession of the firearm which Defendant dropped to the ground, and identified it as a Ruger P89 9mm bearing serial number 313-22721. See Government's Exhibit 1 at 4.

It is further indicated in the police report as to allegations of Defendant's unlawful use of controlled substances:

> Det. Mark Rogers reported that he ran a board of pharmacy report that shows that Critchfield does not have any prescriptions in the last 14 months.
>
> I completed a search warrant for blood & urine through Magistrate Court to determine if Critchfield had any controlled substances in his system at the time of his arrest. The search warrant was then taken to Harrison County Magistrate Court.

The accused then was transported to United Hospital Center where I executed the search warrant and blood samples and urine sample was [sic] taken from the accused. The accused was then transported back before Magistrate Frank DeMarco for arraignment and then to the NCRJ.

On 2/26/16 @ 0830 hours I stopped by the Medical Records Department of United Hospital Center to obtain the medical records for Daniel Critchfield. A search warrant was served on 2/25/16 at UHC for blood and urine, which the urine was tested on that date.

The laboratory report indicated that Critchfield had tested positive for benzodiazepines, THC & amphetamines in his urine. UHC will be holding 2 vials of blood for 30 days to be picked up and then sent to a laboratory for testing.

Government's Exhibit 1, at 4-5.

Upon his arrest, Defendant gave a videotaped interview at BPD. See Government's Exhibit 2. In this interview, Defendant told officers that he stayed the night before with his fiancé at her mother's home in a trailer park behind Oliverio's Restaurant. Government's Exhibit 2, 16:25 to 17:30. He stated that he was walking in Gerhart's neighborhood in search of his fiancé, who he believed he would find at either Belasco's Trailer Park, where his fiancé's brother lived, or Dairy Mart. Id.[5] Further, he stated that, when BPD first encountered him and he turned away, he was attempting to (unsuccessfully) remove the firearm from the pocket of his sweatshirt and clip the firearm onto his waistband in plain sight. Id. at 24:25 to 25:30. This appears to have been an effort to open-carry the weapon and avoid trouble with carrying a concealed weapon impermissibly. Id.

### III. LEGAL ISSUES AND ANALYSIS

The question before the Court is whether Hartley and Lemley had reasonable suspicion to detain Defendant, as detention of Defendant led to law enforcement's discovery of the firearm and controlled substances.

---

[5] See Government's Exhibit 5-A (Gerhart's notation of location of Belasco's Trailer Park and Dairy Mart.) Gerhart testified that Dairy Mart no longer operates a business in this location. [2:52:34].

Defendant contends that the facts here do not give rise to reasonable suspicion and lawful detention. Thus, according to Defendant, evidence (here, the firearm and allegedly unlawful use of controlled substances) obtained thereafter as a result must be suppressed. On the contrary, the Government points out that Gerhart observed objectively suspicious behavior meriting BPD's detention – namely, Defendant's presence in an unexpected place and time, his shifty glances at Gerhart and re-routing of his path of travel, and the weighted front pocket of his sweatshirt.

### A. Legal Principles

As a threshold matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Further, instructive caselaw provides that reasonable suspicion arises from circumstances leading to a stop or search. Ornelas v. United States, 517 U.S. 690, 696 (1996). A court is to review the stop or search "from the standpoint of an objectively reasonable police officer." Id. Specifically, permissible are "brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California, 572 U.S. 393, 396 (2014) (citations and quotations omitted). Such a stop is permitted by an officer if he or she "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968).

The Fourth Circuit has articulated: "The reasonable suspicion standard, like the probable cause standard, is a fluid concept which takes its substantive content from the particular context in which the standard is being assessed." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (citation omitted). Moreover, "because the Terry reasonable suspicion standard is a

commonsensical proposition, '[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." Id. at 782 (quoting United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993)).

Further, the Fourth Circuit has specified that "[r]easonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'" United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (citations omitted). However, an officer cannot make such a stop based on a mere hunch. Rather, "[t]o justify a stop, the officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." United States v. Slocum, 804 F.3d 677, 682 (4th Cir. 2015) (citations and quotations omitted). "The level of suspicion must be a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. (citations and quotations omitted).

In addition, the Fourth Circuit has cautioned that the Government "cannot simply proffer 'whatever facts are present, no matter how innocent, as indicia of suspicious activity.'" United States v. Massenburg, 654 F.3d 480, 489 (4th Cir. 2011) (quoting United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011)). Indeed, "[t]he Government 'must do more than simply label a behavior as 'suspicious' to make it so'; rather, the [G]overnment must be able to 'articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.'" Slocum, 804 F.3d at 684 (quoting Massenburg, 654 F.3d at 491).

Also well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where

its deterrence benefits of exclusion outweigh its substantial social costs." <u>Hudson v. Michigan</u>, 547

U.S. 586, 591 (2006) (citations and quotations omitted).

## B. Analysis

In the case at bar, the question is whether Hartley and Lemley had reasonable, articulable suspicion to stop Defendant as he was walking on Airport Road based upon the information about Defendant relayed to them by Gerhart. Candidly, it is a more difficult determination than often is the case in similar motions referred to the undersigned.

Gerhart formed his suspicions and based his call to Harley on the following: (1) Defendant was walking in the neighborhood from the direction of a vacant home, (2) Defendant's look toward Gerhart seemed to Gerhart as if Defendant had been seen doing something he should not have been doing, (3) Defendant was there at a time of day that seemed unusual to Gerhart, (4) Defendant later doubled back on the route he had been walking when Gerhart first saw him, and (5) Defendant was wearing a hooded sweatshirt with a front pocket that was bulky and weighed-down with something.

Importantly, while en route to locate Defendant, Hartley and Lemley did not have any information other than Gerhart's on which they themselves could have based reasonable, articulable suspicion of Defendant. To be sure, police officers routinely may use information relayed by third parties – such as via a credible 911 call – to help form a basis for reasonable, articulable suspicion to stop someone. And here, Hartley and Lemley had information not just from any third party, but rather from a fellow law enforcement officer, namely, Gerhart. Gerhart was someone with whom Hartley worked professionally, and apparently knew well enough that the two had exchanged mobile telephone numbers. At that time, Gerhart had been in law enforcement for 16 years.

14

But, to be clear, prior to detaining Defendant, Hartley and Lemley had no other information about Defendant other than that which Gerhart had relayed to them. Thus, the undersigned must examine whether the information, and that information alone, which Gerhart relayed to them was enough to establish reasonable, articulable suspicion giving rise to a lawful stop of Defendant.

In any case, the events leading up to (and immediately after) Defendant's stop and detention were rapidly developing and tense. Thus, unpacking the facts and testimony moment by moment is essential. Lemley testified that he and Hartley were in the police vehicle searching for Defendant in response to Gerhart's call. They spotted Defendant from behind, walking up Airport Road, in their same lane of travel. Defendant's walking on the road itself was not unusual, given the absence of a sidewalk. They pulled up behind Defendant, but near enough to him that, apparently, Hartley could gesture, from inside the vehicle, to Defendant to step to the side of the road, and Defendant could see the gesture and understand what it meant. Lemley testified on cross-examination that there was nothing about Defendant, standing alone, in that moment, which was suspicious. It is clear that Hartley and Lemley were initiating a stop based solely on information relayed from Gerhart, not on any independent observation or suspicion of their own.

Importantly, it was at this moment (and not the next, when Defendant handled and exposed the firearm in his pocket) that Defendant was detained.[6] When Hartley gestured with a command

---

[6] The undersigned differs from the Government as to a critical factual point here about when the detention occurred. The Government argues that Defendant was not free to leave the scene, and thus detained, at the moment when Lemley saw Defendant had a firearm and then drew his weapon on Defendant and commanded him to drop the weapon. [ECF No. 23 at 10]. However, according to Lemley's testimony, it appears to the undersigned that the detention actually was moments earlier, and was based solely on information conveyed by Gerhart to Hartley and Lemley. After all, Defendant was not, absent information conveyed by Gerhart, suspicious to Lemley when he first saw Defendant walking on Airport Road. More to the point, Lemley's clear testimony was that Defendant was detained when Hartley gestured to Defendant from inside the vehicle – not moments later in time when Lemley saw Defendant's firearm and commanded him to drop the weapon. Thus, the undersigned analyzes whether there was reasonable, articulable suspicion to detain Defendant here based only on the information conveyed by Gerhart to Hartley and Lemley, not based on facts arising after the moment of detention.

to stop, Defendant immediately began to comply. Lemley testified very clearly that this was the moment of detention. Moreover, it is clear that Defendant in this moment knew Hartley and Lemley to be law enforcement. Although Hartley's vehicle was un-marked, there were other indicia, both of the vehicle and of the officers, that law enforcement was present and directing Defendant to stop. The vehicle's lights, while at the rear of the vehicle, were flashing and bright and likely visible to Defendant. The vehicle had antennas and other such equipment affixed to the exterior indicative of a police vehicle. The vehicle had a spotlight on the driver's side, and possibly had a plate on the front indicating that it was a police vehicle. Inside the vehicle were two uniformed police officers. Moreover, the Government does not argue that law enforcement's presence and command were unclear to Defendant in this moment.

In other words, Defendant was not stopped in the moment _after_ this initial encounter with law enforcement. He was detained the moment law enforcement communicated with him by a gesture commanding him to stop. Therefore, he was detained _prior to_ the moment in which he handled and exposed the firearm in his pocket. Put another way, no facts arising from law enforcement seeing Defendant's firearm gave rise to the detention. Defendant would have been detained regardless of what transpired with a firearm in his sweatshirt pocket, or regardless of whether Defendant had a firearm or other weapon at all.

Thus, the Court must analyze whether law enforcement had reasonable, articulable suspicion to detain Defendant through the lens of what Gerhart conveyed to Hartley. As an initial matter, the undersigned notes that Gerhart called Hartley not as an on-duty law enforcement officer, but as an off-duty officer with apparently personal concerns about an individual near his residence. Nevertheless, even though Gerhart placed his call in such capacity, the undersigned knows of no authority directing that Gerhart's observations (based on his law enforcement training

and experience) should be discounted just because they were personal in nature and he was off-duty. In fact, Gerhart's familiarity with his own neighborhood – with the attendant knowledge of its inhabitants, dwellings, and routines – militates toward a finding of reasonable, articulable suspicion here.

Turning attention to Gerhart's particular observation of Defendant, there was no testimony that he or anyone else observed Defendant in distress or agitation. To be sure, Gerhart did not observe Defendant committing any crime. However, in at least two separate, distinct moments, Gerhart exchanged glances with Defendant in which Defendant struck Gerhart as being furtive and caught in the midst of something he should not be doing. Coupling this with Gerhart's observation of Defendant emerging from an area in the neighborhood where one would not expect Defendant to have a reason to be, at a time of day when such a presence was unusual, the undersigned is mindful of the Fourth Circuit's deference to the practical "judgment of experienced law enforcement officers, 'not legal technicians.'" Williams, 808 F.3d at 246. Moreover, as to this specific neighborhood, the maps which the Government introduced into evidence show its proximity to dense, higher-traffic, and commercial areas. But the neighborhood itself appears to be uniquely situated in the area as spacious and largely residential, with structures that are dispersed and fewer in number, underscoring Gerhart's observation that something was amiss about Defendant's presence there.

In any event, Gerhart's first encounter with Defendant was not, standing alone, enough to yet prompt Gerhart to call Hartley at BPD. Gerhart set about to gather more information and make further observation, seemingly to confirm his suspicion about Defendant. Once he located Defendant after their first encounter, Gerhart was struck by Defendant doubling back on the route he had been walking. Moreover, at this point of observing Defendant again, and observing him

closer, Gerhart was able to specifically note Defendant's appearance and attire. To this point, Gerhart saw something additionally suspicious: the weighted-down pocket of the sweatshirt. Gerhart's training and experience informed him that the sweatshirt pocket, weighted in such a way, might to many of us be unremarkable, but could indicate the presence of weapons, stolen items, or tools for use in the commission of a crime.

None of these factors which Gerhart observed and considered may not, standing alone, give rise to reasonable, articulable suspicion here. But the Court need not decide that. Nor did Gerhart so conclude a single factor was suspicious enough for him to involve BPD. Rather, Gerhart took the time and initiative to gather information and compile a number of observations that, taken together, in his law enforcement officer's mind, were suspicious enough to him that he placed a call to Hartley to suggest that BPD follow up. Given the number of factors which Gerhart was able to observe and articulate as to Defendant's behavior, appearance, location, and movement – combined with Gerhart's law enforcement training and experience – the undersigned cannot find reasonable, articulable suspicion lacking on BPD's part.

Thus, the undersigned finds that law enforcement's stop and detention of Defendant was lawful and rational under the circumstances, such that they did have reasonable, articulable suspicion to do so.

## IV. CONCLUSION

For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Physical Evidence [ECF No. 20] be **DENIED.**

Any party shall have fourteen days from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of**

such objection.  A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted January 29, 2021.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE